**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NORTH CAROLINA**
**CHARLOTTE DIVISION**
**DOCKET NO. 3:12-CR-108**

| | |
|---|---|
| **UNITED STATES OF AMERICA,** ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| **JUSTIN KELLY** ) | |

## I. INTRODUCTION

**THIS MATTER** is before the Court upon Defendant's Motion to Suppress, (Doc. No. 11). The Court previously partially ruled on the motion, denying it on June 13, 2012. (Doc. No. 12). The Court then held an evidentiary hearing on August 13, 2012 and makes the following findings of fact and conclusions of law. Defendant's Motion, (Doc. No. 11), is DENIED for the reasons stated herein.

## II. FINDINGS OF FACT

After the evidentiary hearing on August 13, 2012, the Court makes the following findings of fact:

1. Officer Jason Kerl has worked for the Charlotte-Mecklenburg Police Department for twelve and a half years, (Tr. 33-34), and has worked for the Alcohol Beverage Control Unit for about six (6) years, (Tr. 37). The Alcohol Beverage Control Unit is within the Charlotte-Mecklenburg Police Department, but works closely with Mecklenburg County Alcohol Beverage Control. (Tr. 34).

2. Officer Eric Mickley has worked for the Charlotte Mecklenburg Police Department for seventeen (17) years, where he is currently an Alcohol Beverage Control officer. (Tr. 75).

3. On October 14, 2011, Officer Kerl was working with Sarah Connor, an investigator with the Private Protective Services Board, (Tr. 38), going to several clubs and speaking with the clubs' security for the purpose of following up on complaints of security guards having and using weapons. (Tr. 36).

4. Sarah Connor has a complete list of who is registered to be an armed security guard throughout the state. She is not a sworn law enforcement officer and does not carry a gun or wear a uniform. (Tr. 39, 77). Investigator Connor certifies and licenses armed guards within the State of North Carolina. (Tr. 77).

5. Registered armed security personnel are required by law to carry identification on their person that shows they are certified. N.C. Gen Stat. § 74C-13(d)(1); (Tr. 39).

6. On October 14, 2011, Officer Kerl and Sarah Connor went to Club Kalypso, a public club, (Tr. 49-50, 103), at 5920 North Tryon Street in Charlotte in the Western District of North Carolina. (Tr. 42). That area consists of mostly commercial entities, including a NAPA Auto Parts store and a storage facility in the same building as Club Kalypso, which does not face the street. (Tr. 43-44, 48). Across the parking lot from Club Kalypso is a bowling alley. (Tr. 44).

7. About a week prior to October 14, 2011, Office Kerl had been advised of a report from September 26, 2011, stating that gun shots were fired by security guards at Club Kalypso on that September date. (Tr. 71-72).

8. Club Kalypso has a permit to sell alcohol, but is not licensed with the state of North

Carolina to have armed security guards. (Tr. 103). On October 14, 2011, Defendant was employed by Club Kalpyso as a security guard in the parking lot. (Tr. 104, 108). His employer did not allow him to carry a gun while working. (Tr. 104).

9. There are several parking areas around Club Kalypso. None of them require a key to enter, none require that you enter a gate, and permission is not required to enter the premises while the club is open. (Tr. 48-50, 104-06, 129). The parking areas are accessible by vehicles and pedestrians. (Tr. 49-50). On October 14, 2011, when officers arrived at Club Kalypso, the club was open and patrons had started to arrive. (Tr. 128).

10. On October 14, 2011, Officer Kerl drove up Orr Road, which runs behind the bowling alley across from Club Kalypso. (Tr. 54). He pulled up in the bowling alley parking lot and saw security for Club Kalypso standing in the back of the parking lot. (Tr. 54-55). There were two people working as security, both wearing all black fatigues, and one was dressed in tactical gear. (Tr. 56, 69). There were about nine (9) other police officers in the Alcohol Beverage Control Unit with Officer Kerl on the scene, as well as Sarah Connor. (Tr. 66-67).

11. From the bowling alley parking lot, Officer Kerl could see that the security officer dressed in tactical gear, Defendant, was wearing a gun on the front of his gear in a vest-mounted holster across his chest. (Tr. 56-57, 59-60, 65).

12. Meanwhile, Officer Mickley drove past the front of the club, and also observed Defendant in a tactical-style uniform with a pistol strapped to the front of his vest across his chest. (Tr. 82). Sarah Connor recognized defendant from a prior incident. (Tr. 84, 94-95, 119).

13. The manager of Club Kalypso informed the officers that Defendant worked as a security

guard at the club. (Tr. 62-63).

14. Sarah Connor confirmed that Defendant was not licensed to be carrying a firearm as a security officer. (Tr. 62).

15. Defendant admitted that he has previously fired a gun while at Club Kalpyso. (Tr. 126).

16. Officer Mickley and Investigator Connor approached Defendant and asked if he had credentials to be operating as an armed guard. Defendant stated that he did not have the proper credentials. (Tr. 84). No officer had a gun drawn and Defendant was not placed in handcuffs or seized physically. (Tr. 131).

17. Prior to the evening of October 14, 2011, Officer Kerl had read the statute that requires armed security guards to be registered in North Carolina. He also received the same information from Sarah Connor. (Tr. 67-68). Officer Mickley also understood, from Investigator Connor and the North Carolina statute, that an individual working as an armed security guard must be licensed through the Private Protective Services Board. (Tr. 76, 99).

18. Officer Mickley arrested Defendant for violating N.C. Gen. Stat. § 74C-13A, being an unregistered armed security person, and Investigator Connor removed the gun from Defendant's vest. (Tr. 85-86, 90). Defendant warned Investigator Connor that the gun had a hair trigger and told her to be careful with it. (Tr. 85-86). The gun was loaded. (Tr. 84). The handgun was a .45 caliber Sig Sauer. It had after market upgrades including high visibility sights. (Tr. 86).

19. Officer Mickley then saw a tactical style modified shotgun sitting on the passenger floorboard of a nearby vehicle. (Tr. 87). Officer Mickley could see the shotgun in plain view without entering the vehicle. (Tr. 87-88). Defendant admitted to the officers, (Tr.

89), and to the Court, (Tr. 127), that the vehicle and shotgun were his. In fact, Defendant does not dispute that both the handgun and the shotgun were possessed by him. (Tr. 135). A knife was also confiscated from Defendant. (Tr. 90, 93-94).

20. Ms. Maria Garcia owns Club Kalypso, (Tr. 102), and Defendant does not own the club, (Tr. 129). Ms. Garcia allows police officers in her parking lot and inside her club. (Tr. 107).

### III.  LEGAL ANALYSIS

Probable cause is a "nontechnical conception that deals with the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act." Maryland v. Pringle, 540 U.S. 366, 370 (2003) (internal quotation marks omitted). The standard requires only a "reasonable ground for belief of guilt," id. at 371, and the United States is required to show only a probability of criminal activity. Pennsylvania v. Dunlap, 555 U.S. 964 (2008) (citing Illinois v. Gates, 462 U.S. 213, 235 (1983)).

In the case at bar, the officers saw Defendant in plain view working as a security guard with a handgun strapped to his chest. See, e.g., Minnesota v. Dickerson, 508 U.S. 366, 375 (1993) ("[I]f police are lawfully in a position from which they view an object, if its incriminating character is immediately apparent, and if the officers have a lawful right of access to the object, they may seize it without a warrant."). Officer Kerl saw Defendant from the bowling alley parking lot and Officer Mickley saw Defendant as the officer was driving in front of Club Kalypso. Both could see a weapon strapped to Defendant's chest and both had knowledge that it is a violation of N.C. Gen. Stat. § 74C-13 to carry a firearm while working as a security officer unless an individual has a registered permit to do so and the weapon is owned or leased by the

employer. See N.C. Gen. Stat. §§ 74C-13(a), 74C-13(b)(2). Sarah Connor also knew that Defendant was not a licensed armed guard pursuant to N.C. Gen. Stat. § 74C-13, and Defendant admitted to the officers he did not have a license.[1] See generally Devenpeck v. Alford, 543 U.S. 146, 153 (2004) (noting that while probable cause is an objective standard, the facts an officer knows are relevant to a probable cause analysis). It was clear to the officers from Defendant's dress that he was working as a security officer at the time, which was corroborated by both Defendant and his employer. Therefore, the officers had probable cause to seize the weapon that was in their plain view. See Dickerson, 508 U.S. at 375. Likewise, once officers had knowledge that Defendant did not have a license to carry the firearm that was strapped to his chest, they had probable cause to arrest him for a violation of N.C. Gen. Stat. § 74C-13.[2] See N.C. Gen. Stat. § 74C-18 (classifying an offense of N.C. Gen. Stat. § 74C-13 as a class one misdemeanor). Furthermore, the gun was not seized until after Defendant was arrested, and the police officers were well within constitutional bounds to seize the gun pursuant to a search incident to arrest. See Hill v. California, 401 U.S. 797, 804-05 (1971) (noting that police may seize evidence of the crime for which police had probable cause to arrest a defendant during a search incident to arrest).

With respect to the shotgun, the officers saw it in plain view on the passenger floorboard

---

[1] N.C. Gen. Stat. § 74C-13(d)(1) requires that any armed security guard disclose when approached by an officer that they have the necessary permit.

[2] There was some discussion by defense counsel at the evidentiary hearing about a mistake of law by the officers in this case, in which counsel argued Defendant did not actually violate N.C. Gen. Stat. § 14-269.3. The Court need not decide this issue because the testimony from the officers was that Defendant was violating N.C. Gen. Stat. § 74C-13, not § 14-269.3. Furthermore, probable cause is an objective standard and only requires that probable cause of some crime objectively exists. See Devenpeck v. Alford, 543 U.S. at 146, 153 (2004).

of a vehicle Defendant admitted was his own,[3] and therefore the shotgun is also admissible evidence. See, e.g., Dickerson, 508 U.S. at 375. The evidence indicates there was no search of Defendant's car, but to the extent there was, the only evidence found in the car was the shotgun, which was in plain view of the officers as they stood outside in a public place where they were entitled to be. See Kentucky v. King,131 S. Ct. 1849, 1858 (2011) ("[L]aw enforcement officers may seize evidence in plain view, provided that they have not violated the Fourth Amendment in arriving at the spot from which the observation of the evidence is made."); Georgia v. Randolph, 547 U.S. 103, 118 (2006) ("And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause.").

Because the shotgun was in plain view and within the dominion and control of Defendant, officers had probable cause to seize it. Like the handgun, the Officers knew that possession of the shotgun by an individual working as a security guard was illegal without a license, N.C. Gen. Stat. § 74C-13, and that Defendant did not have the proper license. The officers therefore had probable cause of criminal activity, and properly seized the handgun. It is therefore admissible.

It is of no consequence that the officers had probable cause of a violation of N.C. Gen. Stat. § 74C-13 while Defendant was eventually charged with a federal crime pursuant to 18 U.S.C. § 922(g)(9). See Alford, 543 U.S. at 153 (noting that the crime for which the police have probable cause in their mind does not have to be the same crime from which Defendant is eventually charged).

---

[3] Defendant admitted to the officers (and later to the Court) that both the vehicle and the shotgun were his.

## IV.  CONCLUSION

In effect, Defendant was committing a crime before the officers' eyes.  He was in possession of a gun while working security, which is against the law in North Carolina.  Defendant's legal defenses are a matter for trial and have no bearing on the officers reasonable determination that probable cause existed to arrest Defendant and seize his weapons.  See, e.g., Durham v. Horner, ___ F.3d ___, 2012 WL 3194462 (4th Cir. August 8, 2012); Brown v. Gilmore, 278 F.3d 362, 367-68 (4th Cir. 2002) ("For probable cause to exist, there need only be enough evidence to warrant the belief of a reasonable officer that an offense has been or is being committed; evidence sufficient to convict is not required.") (citing Wong Sun v. United States, 371 U.S. 471, 479 (1963)).

There does not seem to be any search that took place during the relevant time;[4] however, even if there was, Defendant lacks standing to challenge any search of the parking lot area or of Club Kalypso because he, by his own admission, does not own either the club or its parking area.

Consequently, there is no reason to suppress the guns found and seized by the officers or any other evidence from the scene on October 14, 2011.  It is therefore ordered that Defendant's Motion to Suppress, (Doc. No. 11), is HEREBY DENIED.

IT IS SO ORDERED.

---

[4] While Defendant's written motion mentions other areas searched, no such contention was made during the evidentiary hearing on this matter, nor was any evidence produced to suggest any other areas were searched.

Signed: August 29, 2012

Frank D. Whitney
United States District Judge